UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                            :
LUIS POLANCO,                                               :
                                                            :
                                                            :
                              Plaintiff,                    :        19-cv-1409 (LJL)
                                                            :
                      -v-                                   :        FINDINGS OF FACT AND
                                                            :        CONCLUSIONS OF LAW
UNITED STATES,                                             :
                                                            :
                                                            :
                              Defendant.         X
                                                            
------------------------------------------------------------------

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/5/2020__

        Plaintiff Luis Polanco ("Plaintiff" or "Polanco") filed suit against Defendant United

States of America ("Defendant" or "Government") pursuant to the Federal Torts Claims Act (the

"FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq*., for injuries he claims to have suffered in a car

accident on March 6, 2017.  Plaintiff alleges that he suffered serious injuries to his knee, back,

and neck when a vehicle he was operating collided with a vehicle owned by the United States

and operated by David Moya-Gamboa ("Moya-Gamboa"), then an employee of the United States

Department of Labor ("Department of Labor").  Plaintiff alleges that he was driving on 12th

Avenue in New York, New York (commonly known as the "West Side Highway"), in the third

lane from the right, when Moya-Gamboa swerved from the left-most lane into his lane causing

damage to Plaintiff's vehicle and injury to himself.

        The Court conducted a bench trial from October 13, 2020 to October 15, 2020.  During

that trial, it heard from five witnesses, each of whom testified live: Plaintiff, Moya-Gamboa,

Plaintiff's medical expert Dr. Mark S. McMahon, M.D. ("Dr. McMahon"), the United States'

accident reconstruction expert Dr. David J. Bizzak ("Dr. Bizzak"), and the United States'

medical expert Dr. Neil S. Roth, M.D ("Dr. Roth").

For the reasons that follow, the Court finds that Polanco has not proven that the United

States or Moya-Gamboa acted negligently.  It therefore need not reach the questions of causation

and damages.  Judgment will be entered in favor of the United States.  The following constitutes

the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.


### FINDINGS OF FACT[1]

**A.      The Relevant Parties**

1.      Plaintiff Luis Polanco is a 46-year-old resident of New York, New York.  (Tr. at

27:13-14).  He has been employed as a driver for Uber Technologies, Inc. ("Uber") for the past

four years and was an Uber driver on the date of the accident, March 6, 2017.  (*Id.* at 29:15-19;

30:21-31:3.)

2.      David Moya-Gamboa, the driver of the vehicle owned by the United States, is

currently a PhD student at Fordham University.  (*Id.* at 85:7-8.)  On March 6, 2017, he was

employed as a Field Economist by the Department of Labor Bureau of Labor Statistics ("BLS").

(*Id.* at 86:19-87:25.)  The job required him to visit and work with sampled companies along the

Northeast seaboard from New York to Maine, meeting with them to collect data for BLS.  (*Id.* at

87:20-88:21.)  He traveled about 70% of his time for work.  (*Id.* at 88:14-17.)

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

3.      The Department of Labor is and was an agency of the United States of America. It was also the title owner of a 2014 Ford C-Max bearing USA registration tag number G135407P that was operated by Moya-Gamboa on the day of the accident.  (Dkt. No. 17 ¶ 7.)

**B.      The Accident**

4.      On the day and at the time of the accident, Polanco was driving for Uber.  (*Id*. at 30:21-31:2.)  He began driving for Uber at 9:00 a.m. that morning and had approximately five fares up to the time of the accident.  (*Id*. at 31:9-13.)  He dropped off his last fare prior to the accident at Eighth Avenue and 37th Street in Manhattan at 12:00 p.m. and drove to 12th Avenue between 37th and 38th Streets to wait for a fare.  (*Id*. at 31:14-16.)  He waited at that location for an hour without receiving a ride request before deciding to drive to midtown to try to get a fare. (*Id*. at 31:21-32:3.)

5.      Polanco was operating a black-colored 2016 Toyota Highlander, which he had purchased new in August 2016 to use in his employment with Uber. (*Id*. at 70:7-13; Stipulations of Fact ¶ 7; *see also* Polanco Dep. at 27:5-10, 28:9-12.)  Plaintiff had never been in an accident with the vehicle, and the only maintenance it had ever had was an oil change.  (Polanco Dep. At 28:13-29:18, 142:25-143:7, 144:18-21.)  Plaintiff testified that, to his knowledge, no one else had driven his car on public roads.  (Tr. at 73:14-74:1.)

6.      Moya-Gamboa was driving a silver-colored 2014 Ford C-Max owned by the Government's General Services Administration ("Ford C-Max" or "Government's vehicle"). (Stipulations of Fact ¶ 6.)  He was in the process of traveling from the Department of Labor's office at 201 Varick Street, New York, New York to a work meeting in Rhode Island, and planned to travel to Rhode Island via Interstate 95 North.  (Tr. at 92:1-93:11-16.)

7.      Twelfth Avenue is a major urban arterial roadway on the west side of New York City that conveys traffic in a north-south direction.  There are four northbound and four

southbound lanes for traffic, divided by a median barrier.  Each lane for traffic is marked by broken white lines.  On the northbound side of the road, there is also an additional lane for parking.  (Stipulations of Fact ¶ 2.)

8.     On the afternoon of March 6, 2017, at approximately 1:00 p.m., the Government's vehicle and Plaintiff's vehicle collided on 12th Avenue, near the intersection with 52nd Street, in Manhattan, New York.  (*Id.* ¶ 1.)

9.     Three witnesses testified at trial about the accident.  Plaintiff testified that, at the time of the accident, he was driving in the third lane from the curb (second lane from the median) at a speed of 20 to 25 miles per hour.  (Tr. at 36:2-9.)  He also testified that there was little or no traffic.  (*Id*. at 35:15-31:1, 70:3-4.)  As he drove through the traffic light at 12th Avenue and 52nd Street—which was green—a vehicle hit his car on the driver's side by the driver's door.  (*Id*. at 36:25-37:25).  Plaintiff testified that, at the time of the accident, his car was entirely in the third lane from the curb, that he was not attempting to change lanes, and that he was not attempting to make a left turn.  (*Id*. at 38:21-39:4).  In Plaintiff's version of events, at the time of the accident, the Government car was straddling the two leftmost lanes—partly in the leftmost lane (next to the median) and partly in the second lane from the median, where Plaintiff's car was.  (*Id*. at 38:1-7.)

10.    Polanco testified that there was a "hard impact" between the two cars and that, as a result of the accident, his left shoulder hit the interior door of the car, his neck and back hit the seat of the car, and his left knee hit the dashboard or the door.  (*Id*. at 39:13-15, 40:2-18.)  Polanco moved his car to the leftmost lane, next to the median, because he observed the other car in the accident in that lane, and then got out of his car and cursed at the driver of the other car, whom he observed taking photographs. (*Id*. at 41:14-42:24.)  Ultimately, he moved his car to the

rightmost lane, next to the curb, at the direction of the police who were at the scene and completed a police report.  (*Id*. at 46:16-24.)

11.     Moya-Gamboa testified that he left his office on Varick Street in Manhattan that day around noon.  (*Id*. at 93:2-4.)  He recalled the weather being clear and sunny.  (*Id*. at 93:5-7.) He took the route that he regularly took when heading to Rhode Island, leaving the Department of Labor's parking lot on Varick Street and turning right onto Canal Street.  (*Id*. at 93:8-13.)  He then followed Canal Street to 12th Avenue, where he made a right turn onto 12th Avenue and drove into the left lane.  He intended to continue until he reached the exit for I-95 North, which he described as being at around 180th Street.  (*Id*. at 93:8-94:19.)  He characterized the traffic flow as light to moderate and noted that there were no obstructions in front of him, nor any cars directly in front of him in the thirty seconds or so before the accident. (*Id*. at 94:6-9, 96:15-20.) He described that it was his regular practice to travel in the left lane, as "it was easier for me to stay in the left lane and avoid cars that were merging in or merging out of the highway."  (*Id*. at 94:17-19.)  He recalled the accident happening at 52nd Street.  (*Id*. at 94:24-25.)

12.     His car had been stopped at a stoplight but had begun to move forward at approximately 20-25 miles per hour when a black car driven by Polanco made a sharp left turn into Moya-Gamboa's lane.  Moya-Gamboa tried to brake but it was too late and the car hit him (*Id*. at 95:1-12, 97:3-8, 122:7-123:1, 124:11-14, 128:17-21, 150:9-11.)  After the collision, Polanco's car kept moving into the lane and then came to a stop in front of Moya-Gamboa's car between 52nd and 54th Streets.  (*Id*. at 95:21-96:1, 119:18-21, 131:17-21.)  According to Moya-Gamboa, Polanco's car was at an angle of between 20 and 30 degrees—facing between 10 and 11 o'clock on a clock if straight ahead were 12.  (*Id*. at 114:17-20, 118:15-18, 150:9-22.)

13.     Moya-Gamboa testified that both cars came to a stop on the left-hand side of the avenue after the collision and that the driver of the other car came out of his vehicle, walked back and forth, and was very belligerent.  (*Id*. at 99:13-100:11, 142:1-25.)  Moya-Gamboa took photographs.  Moya-Gamboa was not injured from the accident and did not observe any injuries on the driver of the other vehicle (Polanco) who was "moving very normally."  (*Id*. at 144:1, 145:9-20.)  A police officer who was on the scene then asked the two to move their vehicles to the right-hand lane.  (*Id*. at 101:6-15.)

14.     A few days later, after Moya-Gamboa returned from Rhode Island, he completed an accident report.  (*Id*. at 109:1-20; JX 21.)  In the accident report, Moya-Gamboa described the collision much the same as he did during his testimony.  He was "traveling north on the left lane of 12th avenue while vehicle 2 [Polanco's vehicle] was traveling north in the middle lane.  Vehicle 2 sharply merged into the left lane onto the fed vehicle causing the accident."  (JX 21 at US000006.)  He added that "[w]eather conditions were clear, driver visibility was not impaired and it occurred under clear daylight.  Vehicles were traveling approximately at 25mph; accelerating after a traffic light had turned green."  (*Id*.)  He continued, "[a]ccident happened while crossing an intersection and driver of vehicle 2 may have attempted to complete and unsafe and hasty left turn." *Id.*  The Court finds Moya-Gamboa's testimony to be credible.

15.     The Government's accident reconstruction expert, Dr. Bizzak, is a mechanical engineer registered in four states in the United States.  (Tr. at 158:1-22.)  He has a B.S. in mechanical engineering from Texas A&M University, a Master of Science degree in mechanical engineering from Carnegie Mellon University in 1989, and a doctorate in mechanical engineering from that same institution in 1993.  (*Id*. at 158:10-18.)  He has been a professional engineer for over 35 years and for the past 26 years has worked for forensic engineering firm

Romualdi Davidson & Associates (*Id.* at 159:7-60:2.)  Over the course of his career, he has performed in excess of 650 accident reconstructions and has testified as an expert in approximately 250 cases in federal and state court both for plaintiffs and defendants. (*Id.* at 161:7-19, 163:9-64:7.)

16.     Dr. Bizzak reviewed photographs of the collision damage to the two vehicles taken by Moya-Gamboa; the depositions of the two involved drivers; the Complaint; and items that were produced during the course of discovery, including repair estimates for the two vehicles and information from the airbag module in each of the vehicles that was involved.  (*Id.* at 165:3-12.)  Dr. Bizzak could not determine the cause of the collision from the photographs and, in particular, whether it was caused by Moya-Gamboa swerving into Polanco's lane or Polanco swerving into Moya-Gamboa's lane.  (*Id.* at 170:19-71:1.)  He was able to determine that the damage was consistent with a sideswipe collision, where there is a wide area of contact in the collision but minor sheet metal damage with no structural damage to the vehicles.  (*Id.* at 169:11-18.)

17.     Dr. Bizzak also examined the event data recorders for both vehicles.  (*Id.* at 173:2-177:18).  An event data recorder ("EDR" or "black box") is a device located in the airbag control module that records information about a collision that occurs, as well as information about the operation of the vehicle in the moments before the collision.[2]  (*Id.* at 173:6-11.)  Typically, the EDR stores data regarding the minimum travel speed, accelerator pedal position, engine speed, brake status, and steering wheel input.  (*Id.* at 174:20-75:4.)  The trigger for recording information in the EDR is tied to the airbag control module.  If, based upon the

---

[2] For a helpful overview of EDR functions and regulation, *see generally* Daniel Harper, Note, *Automobile Event Data Recorders, and the Future of the Fourth Amendment*, 120 Colum. L. Rev. 1255, 1258-1271 (2020).

accelerations experienced by the vehicle, the airbag control module detects that there has been a collision, the EDR will record the event.  (*Id.* 175:16-76:6, 187:4-17.)  It will do so regardless of whether the airbag is actually deployed (a function of whether the airbag is necessary to protect the occupants of the vehicle based on the severity of the collision and factors such as the weight of occupants and whether they are wearing seatbelts).  (*Id.* at 176:19-77:5.)  If the airbag is deployed, the data is permanently recorded; if the airbag is not deployed, the data will be retained in the memory register until the capacity of the register is exhausted and the data is overwritten.  (*Id.* at 77:5-12.)  The information from EDRs has been shown to be reliable from tests in which the vehicles are instrumented and the data from the EDR is compared to what has been instrumented.  (*Id.* at 225:10-13.)

18.      Dr. Bizzak's review of the download report for Moya-Gamboa's vehicle, the Ford C-Max, revealed that it did not record any event, an outcome he explained as resulting from the level of acceleration and location of the damage on the Moya-Gamboa vehicle.  (*Id.* at 179:6-16.)  The trigger for event recording is based on an algorithm in the airbag module in the passenger compartment.  Because the contact damage was at the right front corner removed from the passenger compartment, Dr. Bizzak concluded that it was likely that the acceleration levels in the passenger compartment did not rise to the necessary level to trigger an event.  (*Id.*).

19.      Dr. Bizzak's review of Plaintiff's car revealed three recorded events in the EDR: a rollover and two side swipes.  (JX 22 at 4.)  The date and time of these events can be determined by the ignition cycle recorded for the event.  (Tr. at 181:19-182:4.)  Under federal mandate, an EDR will record each cycle in which the ignition key is turned from off to on and back as a means for determining when an event occurred.  (*Id.*)  Although the EDR does not provide the calendar date of an event, that information can be estimated from the ignition cycle.  (*Id.* at

182:8-15, 209:9-11.)  The average number of ignition cycles per day is calculated by taking the total number of ignition cycles recorded on the date the EDR is examined and dividing that figure by the number of days from the date the vehicle was placed in service to the date of examination.  (*Id.* at 182:19-83:15.)  Assuming constant usage of the vehicle, it is a matter of basic arithmetic to determine the range of dates associated with any particular ignition cycle. (*Id.*)

20.     Based on that analysis, Dr. Bizzak concluded that the first event recorded in the EDR for Polanco's car is related to the collision that occurred on March 6, 2017 which is at issue in this case.  (*Id.* at 184:23-24.)  The ignition cycle for the first event was 1,857.  (*Id.*[3])  The parties stipulated that Polanco's vehicle was purchased in August 2016.[4]  Assuming the vehicle was placed in service at the beginning of that month, on August 1, 2016, the approximate ignition cycle on March 6, 2017 would be 1,881.  Assuming the vehicle was purchased on August 31, 2016, the approximate ignition cycle on March 6, 2017 would be 1,662.  The ignition cycle on the event report of 1,857 fell comfortably within that range.  (*Id.* 184:20-24.)  Other evidence also supported that conclusion.

21.     Polanco testified that he was not involved in any other collisions, and that a June 2017 event, in which Polanco allegedly backed into a pedestrian, would not have led to the results on the EDR.  (*Id.* at 190:8-19, 209:18-22.)  That evidence was corroborated by information collated from insurers, collision centers, and dealers by an organization named Carfax.  The Carfax report for Polanco's vehicle showed two accidents, not three: one on March 6, 2017 and on in June 2017.  (*Id.* at 264:10-13.)   In addition, although Moya-Gamboa's vehicle

---

[3] The other two events occurred approximately a week before Dr. Bizzak's inspection of the vehicle in December of 2019.  (Tr. 191:2-4.)
[4] A report from Carfax showed that the vehicle was purchased on August 4, 2016. (Tr. 267:13-16)

did not record an event related to the March 6, 2017 collision, Dr. Bizzak concluded that because the contact point of the accident on Polanco's vehicle was at the driver's side door, it was more likely that Polanco's vehicle would have detected acceleration levels sufficient to record the collision.  (Tr. at 179:6-80:3.)  Finally, the actual data itself supported the conclusion that the first event recorded on Polanco's EDR was the collision on March 6, 2017.  (Tr. at 185:16-86:20.)  The EDR recorded a vehicle speed of 20 to 25 miles per hour before the brake was applied and in the 1.4 seconds before the collision.  (Tr. at 186:8-20.)  This data is consistent with Mr. Polanco's testimony that he was traveling 20 to 25 miles an hour shortly before the collision.  (Tr. at 185:24-86:2.)   The acceleration data recorded by the EDR is also consistent with the damage occurring to the Toyota Highlander as a result of the March 6, 2017 collision. (Tr. at 188:7-20.)  That data reflected that the force of the impact of the collision was much more intense at the driver's door than at the rear door, exactly the result one would expect from a collision where the damage occurred at the front door of the car and not at the rear door.  (Tr. at 189:20-90:6.)

22.     Importantly, Dr. Bizzak also was able to determine from the event data how the collision occurred.  (Tr. at 191:5-16.)  The EDR showed a significant left turn of the steering wheel shortly before the collision and then just before impact a sharp correction to the right. This is consistent with Polanco turning to the left before the collision and then trying to turn back to the right when he realized that there was another car in his path.  The data was inconsistent with Polanco driving straight in his own lane, with the Government vehicle driving forward and into the side of his vehicle.  (Tr. at 192:8-93:25.)  The evidence was "more consistent with a turn than a swerve."  (Tr. at 223:2.)  Dr. Bizzak also concluded that at the time of contact between the two vehicles, Mr. Polanco's vehicle was traveling a little over 16 miles an hour.  (Tr. at 221:3-6.)

23.     From the information in the EDR, his observations from the photographs and the nature of the physical damage to the vehicles, and his experience, Dr. Bizzak was also able to determine the force generated by the collision and whether it would have been expected to displace an occupant from their seated position.  (Tr. at 195:9-23.)  From the EDR, Plaintiff's vehicle suffered a peak lateral acceleration of 4.3 Gs over a period of 12 milliseconds, comparable to jumping off of a curb or plopping down in a seat.  (Tr. at 197:3-99:3).  The measure that is often used in accident reconstruction to assess the severity of a collision is the speed change that occurs in the collision, a figure referred to as the "delta-V."  (Tr. at 199:16-24.)  The delta-V is the measurement of the speed of the vehicle before the collision and after the collision; a vehicle traveling 15 miles an hour that hits a brick wall would have a delta-V of 15 miles per hour.  (*Id*.)  It is more important than the absolute speed of any one vehicle in a two-vehicle collision.  (Tr. at 243:22-44:7, 246:8-11.)  The total delta-V that occurred during the collision was 2.8 miles per hour.  (Tr. at 201:17-20.)  According to Dr. Bizzak, that figure is about half of the delta-V that one would experience in a bumper car in an amusement park.  (*Id.* at 201:20-24.)  Based on that analysis, Mr. Bizzak concluded that the forces experienced by the occupant, Plaintiff in this case, would not have caused his body to move from the normal seated position.  (*Id.* at 195:9-17, 257:14-58:3.)  Dr. Bizzak testified he would have reached the same conclusions even without the EDR data based on his experience doing low-speed accident reconstruction—that this was a minor collision without any significant potential for causing injury.  (*Id.* at 225:19-26:8.)  He also testified that the physical evidence was inconsistent with this being a T-bone collision—i.e., one in which the two cars collide at a perpendicular or quite steep angle—because in such an accident one would expect to see greater penetration into the side of the Toyota Highlander and damage to the front of the Ford C-Max (*Id.* at 238:9-20,

269:8-11) and that if the accident had occurred how Polanco described he would have expected to see greater penetration, (Tr. 235:18-21.)

24.     Dr. Bizzak's testimony was generally consistent with, and corroborated by, Moya-Gamboa's testimony.  Moya-Gamboa testified that the collision occurred when Polanco's car made a sharp left turn into his lane and the physical evidence showed that the steering wheel of Polanco's car made a sharp left turn immediately before the accident.  Moya-Gamboa testified that if his car was facing 12 o'clock on a clock at the moment of impact, Polanco's car would have been facing between 10 and 11 o'clock on the clock.  (*Id*. at 150:16-22).  Dr. Bizzak testified that the physical evidence was consistent with that testimony.  If Polanco's vehicle had been directed at 11 o'clock, that would represent 30 degrees and be fairly sharp angle.  (*Id*. 270:2-6.)  Moya-Gamboa testified that he was driving between 20 and 25 miles per hour and that he assumed Polanco was driving at a somewhat faster speed, based on how the accident occurred.  (*Id*. at 143:10-16.)  The information from the EDR showed that Polanco was driving at a speed from 20 to 25 miles per hour in the seconds before the collision.  Plaintiff's counsel argued that the Court should discredit the physical evidence because the physical evidence showing that Polanco had slowed (*Id*. at 221:3-222:4) was inconsistent with Moya-Gamboa's testimony that Polanco's car was driving at 20 to 25 miles per hour and accelerating as Polanco passed the Government vehicle, immediately prior to turning into Moya-Gamboa's lane and colliding with the vehicle.  (*Id*. at 131:15-132:13.)  However, Moya-Gamboa's testimony that he could speak neither to Polanco's actions nor to his speed (*Id*. at 132:9, 137:6-11, 143:18) leaves open the possibility that Polanco had slowed in the split second before turning.  And, in any event, Dr. Bizzak testified that, in his experience, people's recollection of the circumstances of

an accident may not comport with the physical evidence due to perception (*Id*. at 266:22-67:2.) and that it is not uncommon for the physical evidence and testimony to not be in lockstep.  (*Id*.)

25.     A police officer was already near the scene of the accident when it occurred, and collected the information of Polanco and Moya-Gamboa that was necessary to fill out a report. (*Id*. at 101:8-102:19; 46:8-24.)  The drivers left the scene of the accident approximately half-an-hour to an hour after it occurred at which point both drivers drove away from the scene.  (*Id*. at 46:25-47:1.)

26.     Polanco's testimony had notable weaknesses.  His description of the accident and the injuries he suffered was formulaic and lacking in evidentiary detail that not only would have given it authenticity but also would have provided grist for cross-examination.  He was impeached with inconsistent prior testimony from his deposition.  (*Id*. at 70:7-72:25.)  He admitted at trial to having been in an accident in June of 2017—an accident whose scene he left and for which he received an accident report (*Id*. at 74:12-75:11)—but having not disclosed it when asked at his deposition about his involvement in other accidents.  (*Id*. at 78:12-20.)

27.     Polanco experienced no pain in any parts of his body immediately after the accident.  (*Id*. at 47:5-6, 79:14-16.)  Moya-Gamboa observed Polanco pacing between the two vehicles without any indication that he was hurt.  (*Id*. at 100:5-22, 145:11-16.)

C.     **Plaintiff's Alleged Injuries**

28.     At approximately 11:46 p.m. on the date of the accident, Plaintiff took himself to the emergency room of New York Presbyterian Allen Hospital to seek medical treatment. (JX 15 at NYP00120, Tr. 396:13-15).  In the interim between the accident and his going to the hospital, Polanco had rested in his apartment for a couple of hours before waking up with pain in the back of his neck, his lower back, and his left shoulder.  He took ibuprofen to quell the pain.  (Tr. 48:3-8-48, 63:14-20; JX 15 at NYP00123.)  At the emergency room, Plaintiff reported that he was in a

vehicle that was struck from the driver's side, that no airbag deployed, and that he did not feel injured at the time of the accident but went home and later developed neck and left shoulder pain.  (JX15 at NYP00127.)  Plaintiff did not complain of left knee pain to the emergency room providers.  (JX 15 at NYP00120-40, Tr. 397:12-15.)

29.     Upon admission, Plaintiff complained of aching pain in the left neck, shoulder, and back that was 9 out of 10 on a pain scale.  (JX 15 at NYP00123.)  However, on examination at the emergency room, Plaintiff's range of motion and sensation were within normal limits, and he was independent in his ambulation.  (JX 15 at NYP00135, Tr. 398:1-6.)  A cervical spine x-ray showed no evidence of acute spondylolisthesis, fracture, or dislocation "which is essentially a normal x-ray" (Tr. 399:18-21) and a left shoulder x-ray showed no evidence of acute fracture or dislocation—"a normal x-ray."  (Ex. 15 at NYP000238, Tr. 398:24-99:6.)  No CAT scan was prescribed, nor was an orthopedist prescribed—steps that would have been taken had Plaintiff presented with serious neck, back, or shoulder injuries.  (Tr. at 492:16-93:13.)  The emergency room providers diagnosed Plaintiff with a strain of the muscle, fascia, and tendon at neck level— essentially a soft tissue injury.  (Ex. 15 at NYP000129, 400:19-401:4.)

30.     The emergency room providers discharged Plaintiff at 6:30 a.m. on March 7, 2017.  (Tr. 401:20-22.)  He was permitted to travel home by himself, with the discharge mode being walking and with instructions to follow up with his primary care physician.  (Ex. 15 at NYP000130, Tr. 402:8-9.)  He was not referred to any orthopedic specialist.  On discharge, the emergency room providers noted that Plaintiff had reported pain of 0 on a scale of 0 to 10, with 0 being the lowest and 10 being the highest.  (Ex. 15 at NYP000130; Tr. at 401:22-24.)

31.     Two days later, on March 9, 2017, Plaintiff took himself to Smart Choice Medical PC, a clinic, where he began treatment with Dr. Rolando Chumaceiro ("Dr. Chumaceiro") for

injuries allegedly sustained in the accident.  (JX 13 at SC000082-84, Tr. 402:18-03:15.)  At that

time, Plaintiff reported that he had pain in his cervical spine (*i.e.* neck) and lumbar spine (lower

back), on a level of 9 on a scale of 1 to 10.  (Ex. 13 at SC000082, Tr. at 404:11-405:5.)  He also,

for the first time, complained of pain in both his right knee and his left knee of 9 on a scale of 1-

10.  The Government's medical expert testified that, "A level of nine pain is generally somebody

who is in dire need of significant pain relief that generally cannot be adequately maintained

without some type of intermuscular or IV pain medication."  (Tr. at 404:11-405:5.)  However,

Plaintiff did not complain of pain in his shoulder.

  32.  According to the initial examination report, Polanco reported that he was

"finishing up his work day, driving home, [when] he was 'T-Boned' by another vehicle." (Ex. 13

at SC000082.)  The initial examination report noted that "[h]e was taken to the Emergency Room

of New York Presbyterian Hospital" but that he had since returned to work.  (*Id*.)  The clinic

recorded that he was 43-years-old, had a height of 5'10" and weighed 230 pounds, making his

body mass index ("BMI") 33, (JX 13 at SC000082, Tr. 404:4-8.)  Whereas the emergency room

had made no notations with respect to his gait, Dr. Chumaceiro stated that Polanco's gait was

"cautious/antalgic," a description that would imply some muscular imbalance.  (Tr. 407:5-7.)

The emergency room doctors had reported that Polanco's range of motion was within normal

limits, but Dr. Chumaceiro reported that Plaintiff's range of motion with respect to each of his

neck, lumbar spine, right knee, and left knee were all "decreased due to pain and muscular

spasm."  (*Id*. at 405:7-19.)  However, he did not provide any numeric measurement of the

limitation of range of motion.  (*Id*. at 405:11-14.)  He also reported, in summary fashion, that

there was tenderness in each of those four areas.  (JX. 13 at SC000082-83.)  Dr. Chumaceiro's

prognosis for Plaintiff was "guarded" and he prescribed physical therapy three to four times a week for four to six weeks.  *Id.*

33.     Dr. Chumaceiro initially ordered a slew of magnetic resonance imaging ("MRI") scans for Plaintiff, even though—according to the Government expert—those tests were not necessary because there were not physical examination findings that correlated with the need for performing a diagnostic test.  (Tr. at 410:10-23.)  MRIs were performed of Polanco's cervical spine, lumbar spine, thoracic spine, left knee, right knee, left shoulder, and right shoulder.  (JX 14 at CM000004-18.)  Those MRIs were conducted and reports prepared in late March and early April 2017.  The reports prepared by the radiologists found conditions consistent with degenerative disease and not with traumatic injury or acute pathology. (Tr.  415:6-418:23, 420:3-24, 425:15-436:25.)  According to the reports, the MRIs reflected circumferential disc bulges and stenosis in each of the cervical spine, the thoracic spine, and the lumbar spine, conditions that would be normal for someone of Plaintiff's age and body habitus.  (JX 14 at CM000004-05, 43; JX 14 at CM000006-07; Tr. at 415:3-428:24.)

34.     The MRI report regarding Plaintiff's left knee reflected that he had a complex tear of the posterior horn of the medial meniscus and a complex tear of the lateral meniscus, conditions that were degenerative in nature and not acute.  (Tr. at 425:1-429:26; JX 14 at CM000011-12, 43.)  The MRI images themselves, however, did not show a meniscal tear.  (Tr. at 428:19-431:10.)  The MRI reports of the left and right shoulders also were consistent with one another and reflective of conditions that were degenerative in nature, with no evidence of acute tears of the rotator cuff or labrum.  (*Id.* 432:12-36:12; JX. 14 at CM000017-18, 43.)

35.     Plaintiff continued to be treated by Dr. Chumaceiro until March 22, 2018.  (Tr. 408:5-18; Ex. 13 at SC000031-94.)  When he was released from treatment, Dr. Chumaceiro

recorded that Plaintiff had "NO PAIN!," had full ranges of motion of every area measured, including of the neck, shoulders, and lumbar spine, and could return to work on April 2, 2018. (Tr. at 408:19-25.)  By March 2018, Plaintiff had stopped all medical treatment for his injuries allegedly sustained in the March 2017 accident.  (Plaintiff Dep. at 117:11-14.)  He was not taking any medication as of the time of his October 2019 deposition.  (Plaintiff Dep. at 131:3-5.)

      36.     During the course of his treatment by Dr. Chumaceiro, Plaintiff also saw several other doctors.  In late April 2017, Plaintiff began treatment with Dr. Jeffrey Cohen of Cohen & Kramer ("Dr. Cohen").  (Tr. at 449:16-25; JX 16 at CK000029-32.)  The report of Plaintiff's initial visit with Dr. Cohen on April 25, 2017 reflects that Plaintiff reported that he was "involved in a motor vehicle accident in New York City in a driver-sided impact sustaining a dashboard injury to the left knee, left and right shoulder, neck, and back," and that he was in physical therapy, which resulted in no improvement.  The report also indicated—contrary to other prior reports—that Polanco was using a cane.  (Tr. at 450::23-451:9; JX 16 at CK000029; Plaintiff's Dep. 60:5-62:13.)  Unlike Dr. Chumaceiro's report from a month-and-a-half earlier that recorded Plaintiff's weight as 210 pounds, Dr. Cohen recorded Plaintiff's weight as 180 pounds, which would have represented an unlikely 50-pound weight loss in under two months. (Tr. at 451:13-19; JX. 16 at CK000030.)  For the first time, Dr. Cohen noted pain, swelling, redness, and effusion of Plaintiff's left knee and left shoulder, which had not previously appeared in the record, and he failed to record other test results with respect to Plaintiff's left shoulder. (Tr. at 451:20-52:4; Ex. 16 at CK000030-31.)  Dr. Cohen also noted that Plaintiff could not bend his left knee beyond 100 degrees and he did not explain how he evaluated range of motion.  (Tr. at 452:5-9; JX 16 at CK000030.)  He also recorded a 3/5 for left knee strength, meaning that Plaintiff could only barely lift his leg against gravity.  (Tr. at 452:18-24; JX 16 at CK000030.)

Dr. Cohen offered Plaintiff a cortisone injection of his left knee, which Plaintiff declined.  (Tr. at 453:5-8; JX 16 at CK000032.)  After just one visit, Dr. Cohen scheduled arthroscopic surgery of Plaintiff's left knee.  (Tr. at 453:12-14; JX 16 at 32.)[5]  The Government's medical expert, Dr. Roth, testified credibly that there was no basis to credit a majority of Dr. Cohen's findings.  (Tr. at 452:12-17.)  He also testified that the left knee surgery was not medically necessary because, based on the objective data, there was no evidence of a meniscal tear.  (Tr. 454:16-18.)

37.     On July 24, 2017, Dr. Mark Kramer of Cohen & Kramer performed a left knee arthroscopy on Plaintiff for a meniscal tear, an ailment that—as noted—had not appeared on the radiologist's MRI report.  (Tr. at 453:15-22; Ex. 16 at CK000016-17.)  Plaintiff returned to see Dr. Cohen on August 15, 2017.  (JX 16 at CK000012-14.)  During a follow-up visit on August 15, 2017, Dr. Cohen again recorded that Plaintiff's left knee was stable.  He also recorded findings of arthritis with respect to the left shoulder and findings with respect to range of movement and strength that were internally inconsistent and not believable.  (Tr. at 457:2-5; Ex. 16 at CK000012-13.)  Dr. Cohen scheduled Plaintiff for arthroscopic surgery of his left shoulder. (Tr. 457:6-9; JX 16 at CK000014.)

38.     On September 19, 2017, Dr. Cohen performed arthroscopic surgery on Plaintiff's left shoulder.  (Tr. 457:6-9; JX 16 at CK000009-11.)  That surgery, which was out of favor in the orthopedic world for shoulder surgery and medically unnecessary, was performed on September 19, 2017.  (Tr. at 457:25-58:5.)

39.     In late May 2017, Plaintiff saw Dr. Sachin Shah ("Dr. Shah"), a pain management doctor at Smart Choice Medical PC.  During his May 25, 2017 visit with Dr. Shah, Plaintiff

---

[5] The Court omits a complete description of all of the findings of Dr. Cohen and the other doctors, as those are not necessary to the Court's decision.

complained of neck and lower back pain (but not knee or shoulder pain).  (Ex. 13 at SC000158-60.)  Contrary to the report of Dr. Chumaceiro and Dr. Cohen, but consistent with the emergency room report, Dr. Shah reported normal range of motion and normal strength with respect to Plaintiff's upper and lower extremities including his shoulders and knees.  (Tr. at 439:16-21.)  He also reported normal sensation, full reflexes, normal neurological findings, and a normal gait, contrary to what Dr. Chumaceiro reported with respect to gait.  (Tr. at 439:22-440:4; Ex. 13 at SC000159.)  Dr. Shah recorded painful ranges of motion for Plaintiff's cervical and lumbar spine, but he did not record the range of motion values or explain how he measured range of motion.  (Tr. at 440:8-14; Ex. 13 at SC000159-60.)  On May 30, 2017, Dr. Shah performed a lumbar epidural steroid injection for Plaintiff's lumbar spine.  (Tr. at 441:8-10; Ex. 13 at SC000156.)

40.     Plaintiff had a follow-up visit with Dr. Shah on June 27, 2017.  Dr. Shah reported identical results, including pain in the cervical and lumbar spine, but no pain and normal ranges of motion and strength with respect to the upper and lower extremities, including the knees and shoulders.  On July 11, 2017, following that visit, Dr. Shah gave Plaintiff an additional injection in the cervical spine.  (Tr. at 442:18-22; Ex. 13 at SC000146-48, 161-62.)  The pre- and post-procedure diagnoses were cervical spondylosis and cervical strain, respectively—conditions that are degenerative and arthritic in nature and do not reflect acute injury.  (Tr. at 443:1-24; Ex. 13 at SC000161.)

41.     On September 13, 2017, Plaintiff saw orthopedic and spinal surgeon Dr. Jason Gallina ("Dr. Gallina") regarding his lumbar spine.  (Tr. at 444:1-4; Ex. 19 at 1-4.)  Dr. Gallina noted that Plaintiff weighed 225 pounds and had a BMI of 32, findings consistent with those of Dr. Chumaceiro but inconsistent with Dr. Cohen's report.  (Tr. at 444:5-10; Ex. 19 at 1.)  Dr.

Gallina recorded normal strength in all of the areas he tested except for the right calf, including in the shoulder and knee. (Tr. 444:13-15; Ex. 19 at 2-3.) He also made findings with respect to the lumbar spine that Plaintiff had a limited lumbar range of motion of nearly 30 percent of normal, inconsistent with the normal range of motion found shortly after the accident in the emergency room and later by Dr. Shah. (Tr. 445:4-19; Ex. 19 at 2.) Dr. Gallina provided no indication as to how he measured these values. (JX 19 at 2.) Dr. Gallina recommended surgery, which Plaintiff elected against. (Tr. at 448:11-49:3; Plaintiff Dep. at 112:20-116:18.)

42.     In summary, the medical records are inconsistent with one another and inconsistent with the emergency room findings and, in instances, either implausible or insufficiently documented. Although the emergency room technicians recorded a normal range of motion with respect to all of the allegedly affected areas in the immediate aftermath of the accident and Dr. Shah reported a normal range of motion with respect to the knees and shoulders, other doctors reported dramatically different results. The same can be said about the measurement of strength. Some of the results, such as Dr. Cohen's determination of Plaintiff's left knee strength, are not only inconsistent with other results, but are also implausible on their face. In all instances, it is clear (1) that Plaintiff does suffer from some pain in his back and knees and perhaps in his shoulder but (2) that the pain is the result of conditions that are degenerative and arthritic in nature and are consistent with what is normal for someone of his age, weight, and height. Plaintiff has not shown that he suffers pain as a result of the accident.

43.     The parties submitted competing medical expert testimony. Plaintiff's expert was Dr. Mark McMahon. Dr. McMahon is board certified in orthopedic surgery (Tr. at 277:5-10) and has been in the private practice of orthopedic surgery, focusing on shoulder and knee arthroscopic surgery, since 1993. (*Id.* at 279:2-24.) He has not performed spinal surgery for

over 20 years and has had no specialized training in the spine since he completed his residency

30 years ago.  (*Id*. at 334:22-335:2.)  Dr. McMahon has testified in over 240 trials in the past 20

years.  In all of those trials he has testified for the plaintiff.  He prepares more than 100 to 150

expert reports per year and over the past 20 years he has provided approximately 2,000 to 3,000

expert reports, all on behalf of a plaintiff.  He has never served as an expert for a defendant.  He

has provided an expert report in every case in which he has been retained, never declined to take

a case due to lack of merit, and never rendered an opinion that an accident did not cause a

plaintiff's injury.  He has never rendered an opinion that a plaintiff has an entirely good

prognosis.  (*Id*. at 323:13-25:5.)  In 90 percent of the reports he has prepared he has stated that a

person's condition is permanent, and in 90 percent of the reports he has prepared he has stated

that the person's condition interferes with quality of life and activities of daily living.  (*Id*. at

336:9-19.)

44.     Dr. McMahon testified about his October 28, 2019 examination of Polanco.  (*Id*.

at 283:1-24.)  During the examination, he performed active range of motion tests on Polanco's

cervical spine, thoracic spine, lumbar spine, left shoulder, and left knee.  (*Id*. at 300:5-301:13).

To perform those tests, he directed Polanco to move or twist the relevant body parts being tested

and measured Polanco's range of motion without pain.  (*Id*. at 301:14-302:2.)  Dr. McMahon

recorded that Polanco's range of motion with respect to the left shoulder was 40 degrees of

elevation (compared to a normal range of 180 degrees) and 5 degrees externally (compared to a

normal value of 70).  (*Id*. at 302:4-8.)  He also noted that Polanco's extension range of motion in

his left knee was from 0 to 80 degrees, where a normal range of flexion would extend to 130

degrees, (Tr. 304:15-305:10); that Polanco's lumbar spine offered weak forward flexion of 5

degrees (with pain) where 90 degrees would be expected, (*Id*. at 307:4-16.); that Polanco's neck

did not extend or tilt back at all during a test where 60 degrees of movement would be expected, (*Id*. at 308:8-12).  Dr. McMahon opined that each of these range of motion losses was significant.  However, Dr. McMahon did not conduct passive range of motion testing, nor did he know Polanco's ranges of motion before the March 6, 2017 accident.  He stopped his range of motion testing when Polanco reported that he was feeling pain, and he did not test Polanco for Waddell signs—a marker of whether a patient is exaggerating their symptoms.  (*Id*. 326:22–327:4.)  He agreed that if Polanco had been exaggerating his symptoms, it would make his examination findings inaccurate.  (*Id*. 327:19-21.)

45.     Dr. McMahon palpated Polanco's left knee and neck, and Polanco reported pain upon touching but that was based on Polanco's self-report.  (*Id*. at 309:14-22.)  Dr. McMahon also recorded Polanco's left shoulder strength as a 1 on a scale of 1 to 5, but he admitted that he would not know from the test whether the result was a function of Polanco's actual shoulder strength or simply because Polanco chose not to push harder against the examiner (Dr. McMahon) during the test.  (*Id*. 330:24-31:3.)  Under a common muscle testing scale, a score of 1 out of 5 would be barely a twitch and not enough strength to move against gravity, but Dr. McMahon acknowledged that Polanco was stronger than that.  (*Id*. 329:14-330:8.)  Dr. McMahon also did not record Polanco's gait, which he would have if Polanco had a limp.  (*Id*. 331:4-7.)

46.     The remainder of Dr. McMahon's testimony consisted of a recitation of the information contained in Mr. Polanco's medical records, the assertion that the treatment reflected in those records was within the proper standard of care, and the further assertion that, based on his examination of Polanco and his examination of the contents of the record, Polanco's injuries caused pain and resulted in significant limitations in Polanco's neck, lower back, left shoulder,

and left knee.  Dr. McMahon further concluded that Polanco suffered a permanent consequential limitation of his neck or back, left shoulder, and left knee.  (*Id*. at 322:2-8.)  That testimony was based, in part, on Dr. McMahon's understanding—as reported in the records—that the treatments Polanco had received had not relieved his pain.  But Dr. McMahon admitted that he had not reviewed any of the MRI images themselves and was relying only on the MRI reports.  He also admitted that, in his experience, the radiologist interpretation of an MRI image may differ from the doctor's interpretation of those images.  (*Id*. at 332:5-8.)  Furthermore, Dr. McMahon conceded that Polanco's joint arthritis was degenerative; that it was possible that Polanco's left shoulder tear occurred before the March 6, 2017 incident; that he did not know when Polanco first started complaining about left knee pain; that it was possible that Polanco's left knee meniscal tear occurred before the March 6, 2017 accident; and that the bulges in Polanco's spine might be degenerative; and that to herniate a disk, one would need a certain amount of force.  (*Id*. at 332:9-34:4.)  The Court finds that Dr. McMahon's testimony was not credible.

47.     The Government's expert was Dr. Neil Roth.  Dr. Roth is a board-certified orthopedic surgeon with a specialty certificate in sports medicine who did his fellowship in sports medicine with a focus on shoulder, knee and elbow surgery.  (*Id*. at 357:24-59:24.)  He served on the full-time faculty at Columbia Presbyterian Hospital in New York and has been in private practice in sports medicine for 17 years.  (*Id*. at 359:24-360:23.)  He spends 30 to 40 percent of his time performing surgeries.  (*Id*. at 361:24-25.)  He has numerous professional associations and has published on a variety of subjects predominantly related to sports medicine.  (*Id*. at 363:2-64:4.)  He too has testified as an expert and has been retained by both plaintiffs and defendants.  (*Id*. 364:22-365:1.)  The Court accepted Dr. Roth as an expert in the field of orthopedics.  (*Id*. at 365:10-14.)

48.     Dr. Roth conducted a medical examination of Plaintiff on December 9, 2019 and reviewed Polanco's medical records and the diagnostic studies produced by the MRIs as well as the deposition transcripts of Polanco and Dr. McMahon and Dr. McMahon's expert report.  (*Id*. at 365:16-25, 369:1-6.)  Dr. Roth expressed the opinion that at most Polanco had a sprain or a strain or contusion to the left knee, left shoulder, neck and back as a result of the March 2017 accident, which were not significant and did not require the extensive treatment that he underwent.  (*Id*. at 366:7-12.)  He would have expected Plaintiff's bruises to resolve "in one or two weeks at most, maybe a little longer if he was doing physical therapy."  (*Id*. at 366:18-367:1.)  He expressed the further opinions that the reasonable treatment for Polanco's injuries was a short course of physical therapy and that the treatment Polanco underwent was excessive and not medically necessary.  (*Id*. at 367:13-17.)  He did not believe that Polanco suffered any functional limitations or sustained substantial limitations in his ability to perform daily activities as a result of the accident, and opined that the injuries did not limit Polanco's ability to work or interfere with his quality of life and would not limit Polanco in the future.  (*Id*. at 367:18-368:25.)

49.     Dr. Roth testified in detail about the physical examination he conducted of Plaintiff.  (*Id*. at 369:10-372:2.)  Polanco was 43 at the time of the accident and 45 at the time of the examination (*Id*. at 369:23-25.)  He determined that Plaintiff's height was five foot ten inches, his weight was 232 pounds, and his BMI was 34.  (*Id*. at 372:6-16.)  Plaintiff's gait was normal.  (*Id*. at 373:5.)  Dr. Roth conducted range of motion, sensation, reflexes, and motor strength on Plaintiff's cervical spine, the lumbar spine, left shoulder, and left knee, and found they were all normal.  (*Id*. at 374:17-82:15 (cervical spine), 382:13-84:10 (lumbar spine), 388:4-392:17 (left shoulder), 393:4-94:12 (left knee).)  At the same time, however, Dr. Roth also found

evidence on multiple tests of malingering, or that Polanco was exaggerating his symptoms.  (*Id.* at 384:22-390:25, 393:4-94:25.)

50.     Dr. Roth also testified to his opinions regarding Dr. McMahon's opinions.  He testified to the opinion that Dr. McMahon's "examination is implausible at best and objectively not supported by any of the diagnostic studies, not by my examination and additionally not supported by any of the examinations that were performed by Mr. Polanco's own physicians. . . [and] not supported by the emergency room when he presented."  (*Id.* 466:11-17.)  In his view, "Dr. McMahon's findings are the most exaggerated and most severe of any examination in the entire record . . . there's no credibility in this whatsoever."  (*Id.* at 18-20.)

## CONCLUSIONS OF LAW

### A.     Jurisdiction and Venue

51.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b).  All administrative remedies have been exhausted as required by the Federal Tort Claims Act, 28 U.S.C. § 2675(a).  Venue is proper in this District.

### B.     Legal Standards

52.     Pursuant to the FTCA, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671-80, the United States is liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b); *see also Milbrook v. United States*, 133 S. Ct. 1441, 1444 (2013); *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012); *Dershowitz v. United States*, 2015 WL 1573321,

at \*23 (S.D.N.Y. Apr. 8, 2015).  Under 28 U.S.C. § 2671, an "employee of the government"
includes an employee of any federal agency.

53.     The Department of Labor is a federal agency of the United States of America.
The FTCA applies to this case because Moya-Gamboa was an employee of the United States
acting within the scope of his employment at the time of the March 6, 2017, motor vehicle
accident.

54.     In an action brought pursuant to the FTCA, "courts are bound to apply the law of
the state . . . where the [tort] occurred." *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir.
2001); *see also* 28 U.S.C. § 1346(b).  The law of the state of New York applies to this case
because the accident at issue occurred in New York.

55.     To establish that a defendant acted negligently under New York law, a plaintiff
must prove the following three elements by a preponderance of the evidence: "(1) the existence
of a duty on defendant's part as to the plaintiff; (2) a breach of this duty; and (3) injury to the
plaintiff as a result thereof." *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981); *see
also Aegis Ins. Servs., Inc. v. 7 World Trade Co.,* 737 F.3d 166, 177 (2d Cir. 2013); *Cabrera v. United
States*, 2020 WL 5992929, at \*12 (S.D.N.Y. Oct. 9, 2020).  "Negligence . . . is a failure to use
that degree of care that a reasonably prudent person would have used under the same
circumstances; negligence may arise from doing an act that a reasonably prudent person would
not have done under the same circumstances, or from failing to do an act that a reasonably
prudent person would have done under the same circumstances." *Dershowitz*, 2015 WL
1573321, at \*23.

56.     "Under New York law, the burden is on the plaintiff to prove, by a preponderance
of the evidence, that he is entitled to a damages award." *Cabrera*, 2020 WL 5992929, at \*12.

An essential element of a negligence claim is that "the breach proximately caused plaintiff's injuries." *Rhone v. United States*, 2007 WL 3340836, at *6 (S.D.N.Y. Nov. 9, 2007) (quoting *Kane v. United States*, 189 F. Supp. 2d 40, 51 (S.D.N.Y. 2002)).

57.     Under New York's "no-fault insurance" scheme, a plaintiff may not bring suit for non-economic loss arising from the negligent operation of a motor vehicle unless he shows a "serious injury."  N.Y. Ins. Law §§ 5102, 5104; *see, e.g., Satterfield v. Maldonado*, 127 F. Supp. 3d 177, 190 (S.D.N.Y. 2015).  Further, a plaintiff may only bring suit for economic loss— including medical costs, lost wages, and reasonable and necessary expenses—in excess of "basic economic loss," *i.e.*, \$50,000.  *See Satterfield*, 127 F. Supp. 3d at 190.; N.Y. Ins. Law §§ 5102, 5104.  This law applies to FTCA actions brought against the United States where the relevant parties are considered "covered persons" under the "no-fault insurance" scheme.  *See Patrello v. United States*, 757 F. Supp. 216, 218 (S.D.N.Y. 1991).

58.     Plaintiff is a "covered person" under the "no-fault insurance" scheme as the occupant of an insured vehicle in New York.  *See* New York Ins. Law § 5102(j).  The United States of America is a "covered person" as defined by New York Insurance Law § 5102(j).  *See Wirt v. United States*, 732 F. App'x 32, 35 (2d Cir. 2018).

59.     N.Y. Insurance Law § 5102(d) defines "serious injury" as follows:

"Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a nonpermanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

**C.     The parties dispute (1) whether the Plaintiff established negligence; (2) whether the accident caused Polanco's injuries; and (3) whether any injuries he suffered qualify**

**as "serious injury" under the New York no-fault statute. Plaintiff Has Not Established That Defendant Acted Negligently**

60.     In this case, the Court need not go beyond the issue of negligence.  Having heard the evidence and been able to make credibility determinations, the Court finds that Plaintiff has failed to prove that Defendant acted negligently.  For that reason, the Court need not address the issues of causation and "serious injury."

61.     "Negligence cannot be inferred from the mere fact that an accident occurred, nor can it be established by speculation or surmise." *Leonardi v. United States*, 2013 WL 5295714, at *4 (E.D.N.Y. Sept. 18, 2013) (citing *Bernstein v. City of New York*, 69 N.Y.2d 1020, 1021-22 (1987)); *see Lewis v. Metro. Transp. Auth.*, 99 472 N.Y.S.2d 368, 368 (1st Dep't 1984) ("The mere happening of the accident does not establish liability on the part of the defendant.").

62.     Moreover, while inferences of negligence may be drawn from circumstantial evidence, those inferences cannot sustain a finding of negligence unless they are "the only ones which reasonably could be drawn from the evidence presented." *Mehra v. Bentz*, 529 F.2d 1137, 1139 (2d Cir. 1975); *see Molina v. United States*, 2015 WL 4394045, at *5 (E.D.N.Y. July 16, 2015).

63.     "A violation of a standard of care imposed by [New York's Vehicle and Traffic Law] constitutes negligence *per se*." *Dershowitz*, 2015 WL 1573321, at *24; *Holleman v. Minor*, 699 N.Y.S.2d 840, 840 (3d Dep't. 1999); *Packer v. Mirasola*, 681 N.Y.S.2d 559, 559 (2d Dep't 1998).  New York Vehicle and Traffic Law section 388 provides that every "owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicles, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner."  N.Y. Veh. & Traf. L. § 388(1).

28

64.     Section 1128(a) provides that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic … [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." *Id*. § 1128(a).

65.     Further, pursuant to New York law, a driver who has the right of way is entitled to anticipate that other drivers will obey traffic laws which require them to yield. *Jacino v. Sugerman*, 10 N.Y.S. 2d 663, 663 (2d Dep't. 2004).

66.     New York common law also holds that "a driver is negligent when an accident occurs because he or she failed to see that which through the proper use of his or her senses he or she should have seen." *Dershowitz*, 2015 WL 1573321, at *26 (quoting *Katanov v. Cnty. Of Nassau*, 936 N.Y.S.2d 285, 285 (2d Dep't 2012)).

67.     Plaintiff's case here depends on the proposition that the collision on 12th Avenue and approximately 52nd Street occurred because Moya-Gamboa's car crossed out of the left-most lane of 12th Avenue and hit Plaintiff's car, which was driving within its lane.  In Plaintiff's telling, he was driving straight in the third lane from the curb when Moya-Gamboa turned right from the lane Moya-Gamboa was driving in and hit him.  He thus disputes Moya-Gamboa's contrary recollection that it was Plaintiff who swerved left into Moya-Gamboa's lane and not Moya-Gamboa who swerved right into Plaintiff's lane.

68.     The Court finds that the evidence does not support Plaintiff's claim and that Moya-Gamboa was not negligent.  Plaintiff violated Section 1128(a) of New York State Vehicle and Traffic Law.  Plaintiff crossed out of his lane and his actions were the sole proximate cause of the collision.  Accordingly, Defendant is entitled to judgment.  *See, e.g.*, *Peluso v. Martinez*, 24 N.Y.S.3d 731 (2d Dep't. 2016) (affirming grant of summary judgment for defendant where

29

evidence established that plaintiff's actions in attempting to merge from the left lane to the middle lane were the sole proximate cause of the collision); *Raza v. Gunik*, 12 N.Y.S.3d 116 (2d Dept. 2015) (holding that defendant who made unsafe lane change and collided with plaintiff's vehicle was negligent and his negligence was the sole proximate cause of the accident); *Reyes-Diaz v. Quest Diagnostic Inc.*, 999 N.Y.S.2d 98 (2d Dep't 2014) (affirming judgment for plaintiff where defendant violated Vehicle and Traffic Law 1128(a) and plaintiff was free from comparative fault).

69.     First, as noted above, the Court finds that Polanco was not a credible witness as to the facts of the collision. His testimony was conclusory and lacking in details and was impeached in certain instances by his prior deposition testimony. He also had an obvious self-interest in his account. Moreover, the Court finds convincing the medical evidence of malingering. If, as the evidence establishes, Plaintiff presented a misleading account to his doctors, the credibility of his account to the Court of the causes of the collision is diminished.

70.     Second, in what amounted in part to a swearing contest between Polanco and Moya-Gamboa, the Court finds the account of Moya-Gamboa to be the more credible witness. Moya-Gamboa, who had no self-interest in the case and was not personally exposed to liability, testified credibly that he moved into the left lane shortly after entering 12th Avenue and was in that lane when he was hit by Polanco's car. His testimony was supported by logic and common sense. It was undisputed that, at the time of the collision, he was driving to Rhode Island, a trip that he regularly made and that would have taken him up 12th Avenue to approximately 180th street when he would turn off the avenue to head to the interstate highway. It also was undisputed by the parties that the traffic flow at the time of the collision was light to moderate and that there were no obstructions in the left lane. Moya-Gamboa testified that his ordinary

driving pattern—and the one he followed on March 7—was to stay in the left lane until he would

need to exit the avenue.  That testimony was credible and not impeached.  Assuming light to

moderate traffic and no obstructions, there would be no logical reason for a person driving in the

left lane to move into a lane to the right on 52nd Street if that person did not intend to exit until

180th Street.  There simply would have been no reason, and Plaintiff offered none, for why

Moya-Gamboa would have suddenly shifted lanes many miles before his exit or why the

collision would have happened as Polanco testified.

71.     By contrast, there are reasons to believe that the collision occurred as Moya-

Gamboa recalled, even beyond Moya-Gamboa's general credibility and the physical evidence

discussed below.  At the time of the collision, Polanco was an Uber driver in search of a fare.  He

had waited for an hour without receiving a fare.  He would not receive a fare while he was

driving on 12th Avenue; the sooner he arrived at his destination, the sooner he might be able to

attract a customer.  Moreover, he was driving in the third lane from the curb—not a location

from which he would be prepared to exit immediately off of 12th Avenue.  Under these

circumstances, it is reasonable to infer that it was Polanco who swerved into the left lane hoping

to arrive at his destination more quickly rather than Moya-Gamboa who swerved into the right

lane for no apparent reason.

72.     Finally, and importantly, Moya-Gamboa's account was corroborated by the

physical and expert evidence and Polanco's account was contradicted by it.  That physical and

expert evidence independently established that Polanco turned into Moya-Gamboa's car which

was driving within its lane.  The Court found Dr. Bizzak's testimony to be credible.  That

evidence established that the collision was not a T-bone accident as Polanco reported to his

doctors shortly after the event.  It was more consistent with a side-swipe.  The contemporaneous

data from the EDR was inconsistent with Polanco driving straight in his own lane.  It also established, consistent with Moya-Gamboa's testimony, that the steering wheel of Plaintiff's car turned left immediately before the accident and then turned back sharply right as if Plaintiff realized that he was about to hit Moya-Gamboa.  None of Plaintiff's cross-examination successfully impeached or undermined that testimony.

73.     For those reasons, the Court finds that Polanco acted negligently and that his negligence was the sole proximate cause of the collision.  Moya-Gamboa, who stayed in his lane at all times and who was surprised when Polanco's car suddenly moved into his lane, was not negligent.  Under these circumstances, the Court need not reach the separate questions whether the findings as stated above support either causation or serious injury.

## ORDER

For the reasons stated, the Clerk of Court is respectfully directed to enter judgment for Defendant, terminate all pending motions, and close the case.


SO ORDERED.


Dated: November 5, 2020
       New York, New York                    _____
                                             LEWIS J. LIMAN
                                             United States District Judge